***********
The Full Commission has reviewed the prior Opinion and Award based upon the record before Deputy Commissioner Hall and the briefs and arguments of the parties. The appealing party has shown good grounds to receive further evidence, but has not shown good grounds to reconsider the evidence or rehear the parties or their representatives. Accordingly, the Full Commission affirms with modifications the Opinion and Award of Deputy Commissioner Hall.
 ***********
The Full Commission finds as fact and concludes as matters of law, the following, which were entered into by the parties before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. The date of the denied injury, which is the subject of this claim, is December 21, 2009.
2. On such date, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On such date, an employer-employee relationship existed between Plaintiff and Defendant-Employer.
4. On such date, Defendant-Employer employed three or more employees.
5. Defendant-Employer is insured by American Zurich Insurance Company.
6. Plaintiff's average weekly wage is $1,308.00.
7. Defendants denied Plaintiff's claim.
8. Defendants paid $816.00 weekly from December 21, 2009 to April 19, 2010 pursuant to a Form 63. Defendants filed a Form 61 on April 19, 2010.
9. Prior to the date of injury, Defendant-Employer had hired a replacement for Plaintiff.
10. Plaintiff did not return to work for Defendant-Employer following his alleged injury.
11. Plaintiff's issues for hearing:
 a. Whether Plaintiff suffered a compensable injury within the course and scope of his employment on December 21, 2009?
 b. If so, what benefits is Plaintiff entitled to receive?
 c. If Bart Lassiter wrote the letters regarding Plaintiff's termination, are Defendants being stubborn, unfounded and overly litigious to refuse to *Page 3 
stipulate to that fact?
12. Defendants' issues for hearing:
 a. Whether Plaintiff suffered a compensable injury by accident arising out of and in the course of his employment?
 b. What, if any, benefits is Plaintiff entitled to receive?
 c. What, if any, credit are Defendants entitled to receive due to Plaintiff's receipt of unemployment benefits?
 ***********
The following were marked and received into evidence by the Deputy Commissioner as:
 EXHIBITS
1. Stipulated Exhibit 1 — Pre-trial agreement.
2. Stipulated Exhibit 2 — IC forms, ESC records, personnel file, medical records, surveillance reports, and discovery documents.
3. Stipulated Exhibit 3 — Surveillance DVD.
4. Stipulated Exhibit 4 — Pay records from University of Phoenix and affidavit.
 *********** RULING ON EVIDENTIARY MATTER
On June 13, 2011, Plaintiff filed with the Industrial Commission a Motion to admit the following additional evidence:
 1. Medical records of Plaintiff Randall Brummett dated April 5, 2011 through May 2, 2011 which describe plaintiff's diagnosis and treatment for his alleged injury by accident.
 2. Memorandum of employment which was apparently inadvertently redacted *Page 4 
from the employment file produced pursuant to NCIC Rule 607.
On June 22, 2011, Defendants objected to Plaintiff's Motion. On June 24, 2011, Chair Pamela T. Young entered an Order holding Plaintiff's Motion in abeyance until consideration by the Full Commission at the hearing on Plaintiff's appeal.
Pursuant to Rule 701 of the Workers' Compensation Rules of the North Carolina Industrial Commission, the Full Commission hereby ALLOWS Plaintiff's Motion to admit the Memorandum of Employment and DENIES Plaintiff's Motion to admit Plaintiff's medical records dated April 5, 2011 through May 2, 2011.
 ***********
Based upon all the competent, credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 42 years old as of October 14, 2010, the date of his deposition, and lives in High Point, North Carolina. Plaintiff received an undergraduate degree in management with an emphasis in business from Appalachian State University in 1991, and a Master's degree in accounting from Gardner-Webb University in 2007.
2. Plaintiff suffered from migraine headaches prior to his alleged work related accident and injury. Plaintiff treated for this condition with Dr. Raymond Kandt beginning on November 28, 2005, and followed up with Dr. Kandt on two occasions thereafter. Plaintiff also treated for his headaches with Nurse Practitioner Phil Olshinski beginning in approximately 2006. Dr. Kandt prescribed Nadolol, a beta blocker, to help prevent Plaintiff's chronic migraines, and Mr. Olshinski continued to prescribe this medication after Dr. Kandt stopped treating him. Mr. Olshinski testified that Plaintiff complained of active headaches prior to 2008, when Mr. *Page 5 
Olshinski's practice moved to Randleman, North Carolina, but his records following the move do not reflect any additional headache complaints.
3. Plaintiff took Nadolol daily to treat his migraine condition, including on the morning of December 21, 2009.
4. From 2007 through at least the date of his deposition, Plaintiff worked as an associate professor of accounting for the University of Phoenix. In that capacity, Plaintiff taught nine week long online courses which involved interacting with students through email, "chatting" with students in online forums, and tracking students' weekly course goals.
5. Plaintiff received compensation for his work as an associate professor of accounting for the University of Phoenix at the end of each nine week course. Plaintiff received $10,937.87 in wages for his work as an assistant professor of accounting during the 2009 calendar year. Plaintiff received $12,858.30 in wages for his work as an assistant professor of accounting for the 2010 calendar year.
6. Defendant-Employer hired Plaintiff as a controller in July 2006. In that capacity, Plaintiff was responsible for all accounting, human resources, and staff education and training functions, as well as information technology issues. Plaintiff also retrieved Defendant-Employer's mail from the post office each morning.
7. Between late 2007 and 2009, Carter Barton Lassiter and Defendant-Employer's financial advisers met with Plaintiff on a number of occasions to express their concern about Plaintiff's ability to financially control the business. Mr. Lassiter and Defendant-Employer's financial advisers also expressed to Plaintiff their concerns regarding his untimely completion of financial reports and late filing of company taxes. At one point, Defendant-Employer commissioned an audit of Plaintiff's record keeping, of which Plaintiff was made aware. *Page 6 
8. Plaintiff was investigated for alleged misuse of company funds during his employment with Defendant-Employer. Plaintiff wrote himself three $2,000.00 checks, dated October 27, 2009, October 30, 2009, and November 6, 2009, from Defendant-Employer's bank account. Plaintiff testified that the checks he wrote represented reimbursement for one year of health insurance costs for his family, a benefit to which he was entitled pursuant to his employment contract. Plaintiff indicated that he wrote three separate checks because it made it easier for Defendant-Employer to pay him. Plaintiff also indicated that $6,000.00 did not accurately reflect the cost of the health insurance premiums and that the actual cost was probably more than that amount.
9. At the time it occurred, Defendant-Employer was not aware that Plaintiff had written the checks to himself. Plaintiff was hired by Mr. Lassiter's brother, who is no longer involved with Defendant-Employer's company, and Mr. Lassiter was unaware of any agreement to pay Plaintiff's family's health insurance premiums and was unable to locate any written record documenting such an agreement. Although such an agreement has been produced by Plaintiff, as Mr. Lassiter testified, when Mr. Lassiter's brother left the company, Plaintiff and all other employees were informed that any pre-existing agreements were terminated.
10. Mr. Lassiter confirmed Plaintiff's testimony regarding the cost of the health insurance premium, and indicated that $6,000.00 did not accurately reflect the cost of any type of health insurance premium.
11. In the late summer or early fall of 2009, Defendant-Employer made the decision to terminate Plaintiff's employment due to his poor job performance. Melinda Spencer was hired to replace Plaintiff prior to December 21, 2009, and Defendant-Employer intended to keep Plaintiff on during the transition to help resolve the inconsistencies in his accounting. *Page 7 
12. In late December 2009, Mr. Lassiter contacted Plaintiff a number of times and asked him to report to Defendant-Employer's office to "chat about some things." When Plaintiff did not respond, Defendant-Employer notified Plaintiff by letter in early January of 2010 that he was terminated. The letter also indicated that Defendant-Employer was investigating a number of checks written by Plaintiff for which Defendant-Employer was unable to determine any legitimate business purpose, and offered Plaintiff the opportunity to discuss the matter with Defendant-Employer.
13. The Full Commission finds based on the preponderance of the evidence in view of the entire record, that Plaintiff was aware that Defendant-Employer was concerned about his job performance prior to his termination based on his numerous meetings with Mr. Lassiter and Defendant-Employer's financial advisors, and a reasonable person in Plaintiff's position would have known he was facing termination.
14. The basis of Plaintiff's claim is that, on December 21, 2009, after leaving Defendant-Employer's office on his way to the post office, he slipped on a patch of ice in the entranceway of Defendant-Employer's premises, fell backward, hit his head on the ground, and was knocked unconscious.
15. Plaintiff testified that his only recollection of the events of the morning of December 21, 2009 is that he collected several items from his office to take to the post office, and then woke up in an ambulance.
16. Plaintiff has no memory of slipping, falling, hitting his head, or in any way injuring himself on December 21, 2009. There were no witnesses to Plaintiff's alleged slip and fall. *Page 8 
17. During the night prior to the morning of December 21, 2009, a storm deposited ice on the ground on Defendant-Employer's premises. The area where Plaintiff allegedly fell was a highly trafficked area, and Defendant-Employer had attempted to clear the area of ice by shoveling and spreading salt. Mr. Lassiter acknowledged that, despite these efforts, there was some ice remaining in the area, although it was not "covered in ice."
18. Following the alleged fall, Defendant-Employer's warehouse manager, George Smith, found Plaintiff lying on the ground appearing to be unconscious. EMS was contacted, and, upon their arrival, Plaintiff was found to be "conscious and alert but confused." Plaintiff was transported to the emergency room of High Point Regional Hospital where he treated with Dr. Aisha Amin, a hospitalist who is board certified in internal medicine.
19. Dr. Amin diagnosed Plaintiff with an unwitnessed episode of fall based on the history provided by Plaintiff and his wife, and noted that Plaintiff's initial workup was unremarkable except for a slow heart rate.
20. Plaintiff underwent an MRI of the brain, which was normal, and two CT scans of the head, which showed no growth intracranial abnormality. Dr. Amin noted that Plaintiff had some mild scalp tenderness, which meant that there was a feeling of some pain when the area was pressed. However, Dr. Amin did not note any lacerations, contusions, or other objective signs of bruising. She opined that the only evidence that Plaintiff had sustained a head injury was his subjective complaints.
21. Dr. Amin performed an examination of Plaintiff's extremities, and found that he had some superficial abrasions on his knees. She could not offer any explanation as to how Plaintiff would come to have abrasions on his knees if he had fallen backwards. Dr. Amin also did not know whether the symptoms Plaintiff reported were consistent with a blow to the back of the head. *Page 9 
22. Upon admission to the hospital, Plaintiff was also treated by Dr. Kandt, Plaintiff's treating neurologist for his prior migraine condition, who happened to be on call at the time. Dr. Kandt diagnosed Plaintiff with a concussion with loss of consciousness, but he could not definitively say what caused Plaintiff to fall to the ground and hit his head.
23. On January 13, 2010, Plaintiff presented to Dr. Joseph David Stern, a board certified neurosurgeon, who diagnosed Plaintiff with post-concussive syndrome following a slip-and-fall injury and prolonged loss of consciousness. Dr. Stern confirmed that Plaintiff's MRI and CT scans were negative. He also indicated that some of the symptoms Plaintiff reported to him, including inability to focus, inability to complete activities, ringing in his ears, poor sleep, memory loss and loss of sense of smell, were not typical of a patient who hit his head. Dr. Stern deferred to a neurologist with respect to the headache symptoms reported by Plaintiff and to a neuropsychologist with respect to any deficits and whether there was any functional overlay or malingering. With respect to Plaintiff's ability to perform his pre-injury job, Dr. Stern deferred to Plaintiff's treating physicians. Finally, Dr. Stern noted that Plaintiff mentioned a history of tension or muscular headaches, but did not indicate that he suffered from chronic migraine headaches prior to his alleged fall.
24. Plaintiff followed up with Dr. Kandt on January 22, February 4, and March 4, 2010. At his March 4, 2010 visit, Plaintiff complained of recurrent and more severe headaches which differed from the headaches he had experienced previously. Dr. Kandt conducted an examination of Plaintiff which was normal, with the exception of Plaintiff taking notes. Dr. Kandt noted that most people have an excellent recovery following a concussion and do not have post-concussive syndrome. He also noted that, out of the subset of people who develop post-concussive syndrome, most experience headaches for weeks or months, with only occasional patients experiencing headaches for a longer time period. *Page 10 
25. Dr. Kandt did not offer an opinion as to Plaintiff's ability to work in his pre-injury job, nor did he place limitations on Plaintiff's activities or restrict him from returning to work. 26. At the time Dr. Kandt treated Plaintiff, he was not aware that Plaintiff was teaching online accounting courses for the University of Phoenix. However, Dr. Kandt indicated that the fact that Plaintiff was able to teach these courses would not call into question some of the symptoms Plaintiff described such as the inability to organize, concentrate or remember enough to work as an accountant. This was based on Dr. Kandt's opinion that, if people with post-concussive syndrome are given a limited number of responsibilities, they can sometimes complete those responsibilities well.
27. Upon referral from Dr. Stern, Plaintiff met with Dr. Michael F. Zelson, a neuropsychologist with the Moses Cone Health System, on four occasions beginning in March of 2010. Dr. Zelson was not Plaintiff's treating physician.
28. Dr. Zelson administered a battery of standardized neuropsychological tests and questionnaires to obtain objective information on how Plaintiff was functioning. In completing these tests, a process which took up to two hours, Plaintiff exhibited no problems with attention and stated that he did not need to take a break.
29. Plaintiff did not inform Dr. Zelson that he was working as a professor of accounting for the University of Phoenix, and Dr. Zelson testified that, although he was not sure exactly what the job entailed, he was surprised that Plaintiff was able to teach two accounting courses at a time over a nine week period.
30. Plaintiff also did not disclose to Dr. Zelson his prior history of chronic migraines dating back to November 2005 and his use of prescription medication to treat the same. Dr. Zelson opined that this would have been important information "in terms of fitting into the whole picture *Page 11 
because severe headache was one of the major symptoms Plaintiff complained of in relation to his alleged fall.
31. Plaintiff denied to Dr. Zelson any history of negative performance reviews in his job. When asked whether evidence showing that Plaintiff was aware of performance issues prior to his termination would change his conclusions about Plaintiff's condition, Dr. Zelson indicated that it would not, but that it would change his opinion about the accuracy of the subjective history reported by Plaintiff.
32. Plaintiff reported to Dr. Zelson that he became fatigued after playing with his children for a few minutes, from which Dr. Zelson inferred that, after a few minutes of playing with his children, he would either stop the activity entirely or take a rest and then resume the activity. When asked whether video surveillance footage showing Plaintiff playing with his children continuously for 63 minutes was inconsistent with Plaintiff's statement to him, Dr. Zelson replied, "Possibly."
33. Dr. Zelson opined that the duration of Plaintiff's symptoms, over a year following his alleged fall, placed him in the minority of people with mild traumatic brain injuries.
34. Between April 2010 and January 2011, Plaintiff treated with Dr. Christine Hagen, a fellowship certified neurophysiologist, at Headache Wellness Center. Plaintiff referred himself to Dr. Hagen.
35. Dr. Hagen prescribed Plaintiff Topamax, a preventative headache medication, and performed trigger point injections in May and June 2010, which decreased the frequency of Plaintiff's headaches.
36. Due to the side effects Plaintiff was experiencing while on Topamax, Dr. Hagen changed Plaintiff's prescriptions to Neurontin, Zonegran, and Effexor. Dr. Hagen also began a *Page 12 
second series of trigger point injections in January 2011.
37. As Dr. Hagen's practice does not assign work restrictions for patients, Dr. Hagen deferred to Plaintiff's treating physicians on the issue of Plaintiff's ability to return to work.
38. Although Plaintiff alleges problems with confusion, memory loss, extreme head pain, and completing tasks, he drives his children to school on a regular basis. Surveillance video shows him doing this as early as January 7, 2010, just over two weeks after the date of Plaintiff's alleged accident. Dr. Zelson noted that, based on the symptoms reported by Plaintiff, he would have some concern about Plaintiff driving a car.
39. Plaintiff testified that, as a result of his alleged injury, his head pain worsens when he is on his feet for an extended period of time, that he can only focus for 10 to 15 minutes at a time, and that he tries to do as little as possible due to his pain.
40. Surveillance of Plaintiff conducted in January, February, and May of 2010 show Plaintiff engaging in various physical activities. On May 12, 2010, surveillance video documented Plaintiff at a soccer park where he instructed his children on how to play soccer and baseball. Plaintiff walked, bent at the waist, knelt, got off the ground from his knees, kicked a soccer ball, threw and caught a baseball, swung a bat, and tossed a baseball in the air and hit it with a bat. Plaintiff engaged in this activity for over an hour without giving any indication of fatigue or pain.
41. On May 20, 2010, surveillance video again documented Plaintiff engaging in strenuous physical activity without any indication of fatigue or pain for over 40 minutes. On that occasion, Plaintiff was seen carrying boxes and containers of various sizes from storage units into a garage without hesitation.
42. The objective testing conducted following Plaintiff's alleged fall, namely his MRI and CT scans, were determined to be normal by the physicians who reviewed them. Therefore, *Page 13 
Plaintiff's treating physicians' opinions regarding Plaintiff's current condition, and their opinions differentiating between the headaches Plaintiff reported following his alleged fall and Plaintiff's pre-existing chronic migraine condition are based on the subjective history and symptoms reported by Plaintiff. However, the evidence of record shows that Plaintiff consistently failed to inform his treating physicians of key facts which may have affected their opinions, such as his pre-existing chronic migraine condition, his ability to perform his job as an associate professor for the University of Phoenix, and his ability play with his children or engage in other physical activities for extended periods of time. Furthermore, as Dr. Zelson noted, the fact that Plaintiff inaccurately reported one aspect of his history called into question the accuracy of the remainder of the subjective history reported by Plaintiff.
43. Based upon the preponderance of the evidence in view of the entire record, the Full Commission does not find Plaintiff to be credible regarding his alleged work related accident of December 21, 2009 or the injury he alleges to have sustained as a result. Consequently, the Full Commission finds based on the preponderance of the evidence in view of the entire record that any symptoms Plaintiff experienced following his alleged work related accident are not causally related to the alleged work related accident.
44. Plaintiff applied for and has received unemployment benefits in the amount of $505.00 per week since May of 2010.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to prove that he sustained a compensable injury by accident on *Page 14 
December 21, 2009 as defined by N.C. Gen. Stat. § 97-2(6).
2. North Carolina law requires that where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury. Click v. Pilot Freight Carriers, Inc.,300 N.C. 164, 265 S.E. 2d 389 (1980). Additionally, "the entirety of causation evidence" must "meet the reasonable degree of medical certainty standard necessary to establish a causal link." Holley v.ACTS, Inc., 357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003);Young v. Hickory Bus. Furn., 353 N.C. 227, 538 S.E.2d 912 (2000). "Although medical certainty is not required, an expert's `speculation' is insufficient to establish causation." Holley v. ACTS, Inc.,357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003).
3. In the instant case, the evidence of record clearly demonstrates that Plaintiff failed to provide an accurate history to his physicians, and therefore, the opinions given by those physicians, which were based on Plaintiff's subjective history and complaints, fail to establish that Plaintiff's current medical condition is the result of the alleged December 21, 2009 work related accident and not Plaintiff's pre-existing chronic migraine condition or other causes. N.C. Gen. Stat. § 97-2(6); Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003); Young v. Hickory Bus. Furn.,353 N.C. 227, 538 S.E.2d 912 (2000); Click v. Pilot Freight Carriers,Inc., 300 N.C. 164, 265 S.E. 2d 389 (1980).
 ***********
Based on the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for benefits as a result of his alleged December 21, 2009 *Page 15 
work related accident and resulting injury is hereby DENIED.
2. Each side shall bear its own costs.
This the ___ day of October, 2011.
 S/___________________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/_____________ STACI T. MEYER COMMISSIONER
 S/_____________ CHRISTOPHER SCOTT COMMISSIONER *Page 1